**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Norma Coleman, et al., <br> Plaintiffs, <br> v. <br> Home Health Resources Incorporated, et al., <br> Defendants. | No. CV-15-01332-PHX-NVW <br><br> **ORDER** |

Before the Court are the Motion for Summary Judgment by Defendants Home Health Resources, Inc. and The Crossing: Hospice Care, Inc., (Doc. 82) the Response, and the Reply.

## I. FACTUAL BACKGROUND

The following facts are construed in the light most favorable to the plaintiff, who is the non-moving party.

Defendants are companies who provide hospice care and home nursing services to patients in Arizona. (Doc. 82 at 2.) Plaintiff Norma Coleman is a seventy-six-year-old African-American woman who worked for Defendants (she was jointly employed by both) from February 7, 2007, until July 11, 2011. (Doc. 92, ¶ 296.) She began as an administrative assistant to Defendants' chief financial officer. (Doc. 92, ¶ 306.) In her first performance evaluation, issued three months into the job, Coleman's supervisor

rated her as meeting or exceeding expectations in every category assessed. (Doc. 92-1 at 3.)

In August of 2007, within about six months of starting, she was promoted to the position of Human Resource/Payroll Manager, in which she took on new duties managing Defendants' human resources department while still retaining the bookkeeping responsibilities that were originally the sole province of her job. (Doc. 92, ¶¶ 310-311; Doc. 79, ¶ 58.) Her first three performance evaluations in this new position again reflected that she met or exceeded the expectations of her supervisor in every category of review. (Doc. 79-2 at 29, 31, 13.)

Over time, however, Coleman came to believe she was making less than her younger, non-African-American colleagues. (Doc. 92, ¶ 320.) In the early fall of 2010, she decided to ask for higher pay, but Coleman's supervisor, Lori Thomas, denied her request on the purported grounds that the company had implemented a "freeze" on all pay raises. (Doc. 92, ¶ 321.) The parties disagree as to whether there was in fact a freeze in place at the time. (Doc. 92, ¶ 323; Doc. 79, ¶ 73.) Coleman, however, heard about other employees receiving raises and went to her supervisor a second time to seek a pay increase. (Doc. 92, ¶ 324.) She was again rebuffed. Coleman's salary was never increased, but Defendants did pay her a discretionary bonus at the end of 2010. (Doc. 79, ¶ 99; Doc. 92, ¶ 330.)

On October 15, 2010, shortly after Coleman requested a formal raise, Thomas issued her a "written warning for her work performance" identifying four areas "requiring immediate improvement." (Doc. 92, ¶ 327; Doc. 79-2 at 15.) First was "Employee Files": The warning specified that after auditing the company's personnel files, several required items were found to be incomplete or missing. (Doc. 79-2 at 15.) Second was "Time Management": The warning noted that while there was a "back log [sic] of HR" work, "[a]ssistance has been offered . . . but has not been utilized." (*Id.*) Third was "Attitude": The warning stated that Coleman "becomes very unapproachable" when situations upset her, and that it is "inappropriate to vent to clerical staff." (*Id.*) Fourth,

framed more as an instruction, was "Become more empowered in her role": The warning reminded Coleman of her specific responsibilities to ensure HR compliance. (*Id.*) At the end of the document was a general admonition: "Failure to adhere to the conditions of this written warning, development of new or related problems, and/or continued unsatisfactory performance will lead to more serious corrective action up to and including discharge." (*Id.*) Coleman maintains that Defendants had a stated policy of giving employees an oral warning before a written one, but that Defendants did not give her an oral warning before issuing her the written document on October 15, 2010. (Doc. 79-1 at 581-85.)

On November 1, 2010, Coleman filed a Charge of Discrimination against Defendants with the Equal Employment Opportunity Commission (the "2010 EEOC Charge"). (Doc. 92, ¶ 331.) The charge alleged race, gender, and age discrimination, as well as a claim of retaliation. (Doc. 79, ¶ 135; Doc. 92, ¶ 135.) It covered "all allegations of discrimination against Defendants prior to October 15, 2010." (Doc. 79, ¶ 136; Doc. 92, ¶ 136.) The charge was ultimately dismissed by the EEOC on October 19, 2011. (Doc. 79, ¶ 149; Doc. 92, ¶ 149.)

On November 10, 2010, Defendants issued Coleman a verbal warning related to her earlier performance evaluation; Defendants did not know about the 2010 EEOC Charge until after they issued the warning.[1] (Doc. 82 at 5; Doc. 79-5, ¶ 19; Doc. 79-1, ¶ 45.) Nevertheless, following the charge Defendants engaged in a variety of conduct Coleman interprets as retaliatory:

- Shortly after Coleman filed the charge, Theresa Lungwitz, Defendants' founder and CEO, met with Coleman, expressed "bewilderment" about the charge, and suggested Coleman withdraw the charge, doing so in a way that

---

[1] Defendants state in their Statement of Facts that the warning was issued November 10, 2011. (Doc. 79, ¶ 139.) This appears to be in error, as the evidence in the record uniformly reflects an issue date of November 10, 2010. *See* Doc. 79-5, ¶ 19; Doc. 79-1, ¶ 45.

made Coleman feel "intimidated" and "scared."  (Doc. 79, ¶¶ 144-45; Doc. 92, ¶¶ 333-35.)

- On December 13, 2010, just one month after Coleman filed the claim, Lori Thomas admonished Coleman for failing to update employee files in a timely fashion when the delay may actually have been the fault of someone else. (Doc. 92, ¶ 337-38.; Doc. 79, ¶ 80.)

- On May 24, 2011, Defendants issued Coleman a written warning for missing a work-related telephone hearing when in fact, according to Coleman, she merely arrived seven minutes late.  (Doc. 79-1 at 448.)  She listened in on the proceeding by phone since she was neither a witness nor a company representative for the hearing.  (Doc. 92, ¶ 338-39.)

- Defendants assigned Coleman to work the office's reception desk on top of her other job duties, which interfered with her ability to complete her work as Human Resource Manager.  (Doc. 92, ¶ 341.)  Coleman maintains she was "the only management employee" routinely required to work the reception desk. (Doc. 92, ¶ 342.)

- After Coleman filed her first charge, Defendants began to exclude her from meetings relevant to her work in human resources.  (Doc. 92, ¶ 343.)

- They also began excluding her from employee exit interviews despite having previously required that she attend them.  (Doc. 92, ¶ 344.)

- Defendants' management staff "stopped greeting Ms. Coleman and virtually refused to speak to her."  (Doc. 92, ¶ 345.)  In one instance, Coleman greeted Theresa Lungwitz, and Lungwitz replied, "[W]hy are you still here."  (Doc. 92, ¶ 346.)

- Defendants excluded Coleman from a co-worker's birthday party despite inviting "everyone else in the office."  (Doc. 92, ¶ 347.)

- Lori Thomas began telling employees to no longer direct employee-related documents to Coleman.  (Doc. 92, ¶ 348.)

- On her May 31, 2011 performance evaluation, Coleman's supervisors gave her a "needs improvement" rating for nine different areas of her job. (Doc. 92, ¶ 349.) She also received a rating of "exceeds the standard" in one area and "meets the standard" in three other areas. (Doc. 79, ¶ 192; Doc. 92, ¶ 192.)
- Despite asking Thomas to discuss the evaluation with her, Thomas did not meet with her to go over it. (Doc. 92, ¶ 351.)
- After Coleman wrote a note asking Lungwitz to review the negative evaluation, Lungwitz told Coleman she would meet with her after returning from a vacation. Coleman was terminated from her position on July 11, 2011, before any meeting ever took place. (Doc. 92, ¶ 353.)

Coleman filed a second Charge of Discrimination with the EEOC on September 26, 2011 (the "2011 EEOC Charge"). (Doc. 92, ¶ 365.) That charge alleged retaliation by Defendants in response to Coleman's first charge. (Doc. 92, ¶ 366.) The EEOC concluded there was "reasonable cause to believe [Defendants] retaliated against [Coleman] . . . when [they] discharged [Coleman] in retaliation for engaging in a protected activity." (Doc. 92-1 at 20.) Coleman filed this action on July 15, 2015. (Doc. 1.)

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment should be granted if the evidence reveals no genuine dispute about any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one that affects the outcome of the action under the governing law, and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

It is the moving party's burden to show there are no genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Upon such a showing, however, the

burden shifts to the non-moving party, who must then "set forth specific facts showing that there is a genuine issue for trial" without simply resting on the pleadings. *Anderson*, 477 U.S. at 256. To carry this burden, the nonmoving party must do more than simply show there is "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Id.* at 587. "A court must view the evidence 'in the light most favorable to the [non-moving] party.'" *Tolan v. Cotton*, --- U.S. ----, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 249).

**B. Retaliation**

Only one claim from Coleman's original complaint remains at issue: retaliation under both Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967 (ADEA). (Doc. 93 at 3 n.2.) Both statutes prohibit employers from discriminating against employees for having exercised rights granted to them by the respective provisions. *See* 42 U.S.C. § 2000e-3(a) (prohibiting discrimination where employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any matter in an investigation, proceeding, or hearing under this subchapter"); 29 U.S.C. § 623(d) (prohibiting discrimination against an employee who "has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter"). The Ninth Circuit has "long considered the ADEA retaliation provision to be the 'equivalent of the anti-retaliation provision of Title VII.'" *Stilwell v. City of Williams*, 831 F.3d 1234, 1246-47 (9th Cir. 2016) (quoting *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996)). *See also Kessler v. Westchester Cty. Dep't of Soc. Services*, 461 F.3d 199, 205

(2d Cir. 2006) (concluding the two provisions are "nearly identical" and should be analyzed under "the same standards and burdens"). The same analysis thus applies to both.

To make out a prima facie case of retaliation under either statute, a plaintiff must show "that (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action." *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000) (Title VII); *Poland v. Chertoff*, 494 F.3d 1174, 1179-80 (9th Cir. 2007) (ADEA). If a plaintiff can show all three of these, the burden of production shifts to the defendant "to articulate a legitimate nondiscriminatory reason for its decision." *Ray*, 217 F.3d at 1240. "If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive." *Id.* On summary judgment, a Title VII or ADEA plaintiff's burden of evidence is "minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). However, even with this low burden, a plaintiff must do more than simply make out a prima facie case; he or she "must tender a genuine issue of material fact as to pretext in order to avoid summary judgment." *Id.* at 890.

**III. ANALYSIS**

**A. Protected Activity**

Coleman engaged in protected activity when she filed the 2010 EEOC Charge. That charge makes out the first element of a prima facie case.

Coleman also asserts she engaged in protected activity when she asked for higher pay and challenged her supervisor's assertion that the company had put a freeze on raises. (Doc. 93 at 6-7.) Coleman characterizes this as an "informal complaint of discrimination subject to protection under Title VII." (Doc. 93 at 7.) But even an informal complaint must allege unlawful discrimination. Coleman points to no evidence that she specified anything of the sort to her supervisors, formally or informally, before filing her 2010

EEOC Charge. All she did was challenge the veracity of Lori Thomas's statement that the company had frozen pay raises.

The authorities she cites do not establish that what she did amounts to protected activity. Coleman points to *E.E.O.C. v. Hacienda Hotel*, 881 F.2d 1504, 1514 (9th Cir. 1989), *overruled in part by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), *and Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), but that case says nothing about what may or may not suffice for an informal complaint.[2] She also points to *Hubbard v. Total Communications, Inc.*, 576 F. Supp. 2d 314 (D. Conn. 2008), which is similarly inapposite. *Hubbard* involved an informal complaint of sexual harassment where the plaintiff, a female employee, specifically complained that "guys" had been given the opportunity for raises when she had not and that she was "tired of being treated 'differently than every one [sic] else.'" *Id.* at 318. *Hubbard* is materially different from this case. Coleman has pointed to nothing in the record here indicating she even hinted at discrimination on the basis of any status protected under Title VII or the ADEA. She simply complained to Thomas that other employees had received raises when she had not despite Thomas's insistence that the company had frozen pay. Without communicating that she believed this to be unlawful discrimination, Coleman did not engage in conduct protected under Title VII or the ADEA. As a matter of law, asking for a pay raise is not protected activity. The only protected activity she engaged in was the filing of her EEOC charge.

**B. Adverse Employment Action**

The anti-retaliation provisions of Title VII and the ADEA encompass more than just "discriminatory actions that affect the terms and conditions of employment." *Thompson v. North American Stainless, LP*, 562 U.S. 170, 174 (2011). Rather, each provision "prohibits any employer action that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotation

---

[2] Moreover, the specific quoted language Coleman attributes to *Hacienda Hotel* does not appear in the opinion at all. *See* Doc. 93 at 6-7.

- 8 -

marks omitted). Such actions must be "non-trivial." *Reynaga v. Roseburg Forest Products* (*Reynaga II*), 847 F.3d 678, 693 (9th Cir. 2017) (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000)) ("[O]nly non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation.").

What actions meet this threshold depends heavily on the circumstances. "Termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion" all may qualify as adverse employment actions. *Brooks*, 229 F.3d at 928 (citing *Ray*, 217 F.3d at 1243). The transfer of job duties, lateral transfers, and the initiation of administrative inquiries also may suffice. *See Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (transfer of job duties); *Ray*, 217 F.3d at 1241 (lateral transfers); *Poland*, 494 F.3d at 1180 (initiating administrative inquiries). On the other hand, "[m]ere ostracism by coworkers" is insufficient. *Manatt v. Bank of America, NA*, 339 F.3d 792, 803 (9th Cir. 2003).

The Ninth Circuit's recent decision in *Reynaga II* sheds some light on which are "trivial." There, two millwrights of Mexican descent sued their former employer alleging a hostile work environment, disparate treatment, and retaliation under Title VII. *Reynaga II*, 847 F.3d at 682-83. The plaintiffs alleged five acts of retaliation: (1) assignment to work at a "powerhouse" facility while other millwrights worked better jobs; (2) retention at part-time status while other employees were made full-time; (3) deprivation of "work orders," leaving them to consult a work board to determine what jobs to do; (4) receiving the same workload as a pair that other workers received individually; and (5) termination. *Id.* at 694. Despite reversing on other grounds, the Ninth Circuit agreed with the district court's determinations as to which actions constituted "adverse employment actions" and which did not. *Reynaga II*, 847 F.3d at 678. The district court had concluded that (1) was trivial, since the record did not provide "any indication that 'powerhouse' duty was an extraordinary work assignment"; (3) was trivial because "Plaintiff continued to work

- 9 -

as before, but merely prioritized 'things to do' based upon a posted 'list of things'"; and (4) was trivial because the plaintiff was consulted before the change but did not object, and there was no evidence that his work load actually increased. *Reynaga v. Roseburg Forest Products* (*Reynaga I*), No. 6:11-cv-6282-MC, 2013 WL 6531122, at *11 (D. Or. Dec. 12, 2013), *aff'd in part and rev'd in part by Reynaga II*, 847 F.3d at 695. (Action (2) was deemed to lack a causal connection, while (5) sufficed for a prima facie showing of adverse action. *Reynaga I*, 2013 WL 6531122, at *11.)

Some of the actions Coleman points to here do clearly suffice as adverse employment actions. First and foremost, there is no question Coleman's 2011 termination is an adverse employment action. Second, the negative performance reviews, warnings, and admonishments could deter a reasonable worker from exercising her rights under the law. *See Brooks*, 229 F.3d at 928. These include Coleman's December 13, 2010 admonishment by Lori Thomas, her May 24, 2011 written warning, and her May 31, 2011 poor performance evaluation. Those are prime facie adverse employment actions.

On the other hand, several actions do not suffice as adverse employment actions. First, the allegations that colleagues stopped greeting her, that Theresa Lungwitz asked her why she was still there, and that she was excluded from a coworker's birthday party are ostracism. "Mere ostracism in the workplace is not grounds for a retaliation claim." *Manatt*, 339 F.3d at 803. As a matter of law these actions thus are not adverse employment actions.

Second, Coleman asserts that Defendants began excluding her from employee termination meetings, even though she was previously required to attend them. (Doc. 92, ¶¶ 343-44.) However, the evidence in the record (which consists of Coleman's own testimony) reveals only one specific instance in which she was denied attendance at an employee's termination meeting. (Doc. 79, ¶ 272; Doc. 92; ¶ 272.) While Coleman maintains she was excluded from others, she could not identify any additional specific instances of exclusion—but did admit she continued to attend at least some. (Doc. 79,

- 10 -

¶¶ 274-75; Doc. 92, ¶¶ 274-75.) The evidence thus shows that Coleman was excluded from one meeting but still allowed to attend others. Attendance at the meeting or meetings was for the employer's needs, not for the employee's benefit. As a matter of law it is too trivial to deter a reasonable employee from pursuing discrimination actions in the future.

Third, Coleman contends she was "the only management employee asked to routinely staff the reception desk," which prevented her from completing her work as Human Resource Manager. (Doc. 92, ¶¶ 341-42.) The only evidence Coleman points to does not establish that she was assigned front desk work disproportionately compared to other management-level employees. Coleman testified that she could not see the front desk from her office, could not remember seeing the owner, Theresa Lungwitz, ever work there, and saw Lori Thomas work the desk "probably more than once, a couple of times." (Doc. 79-1 at 609-10.) Several emails from Lori Thomas suggest Coleman worked significant hours at the front desk during one week in January of 2011 to cover for another employee who had to be away. (Doc. 92-1 at 7.) Coleman was also assigned Thursdays on a "phone schedule" as of late April 2011, and had to cover the phone for one hour one day in May for an employee who left early. (Doc. 92-1 at 10-11.) The record does not say whether covering the phone is the same as covering the front desk. But even if it is, Coleman has not met her initial burden to produce evidence that she had to work the desk more than any other similarly situated employee. In other words, she has not shown that to be "an extraordinary work assignment." *See Reynaga I*, 2013 WL 6531122, at *11. The fact that she did not see any of her supervisors working the front desk establishes nothing given that she could not observe the desk most of the time. And the emails she points to simply show she sometimes covered the front desk and/or the phone but say nothing about how frequently she did so relative to other management-level employees. She was not similarly situated with the owner. Coleman must proffer at least some evidence beyond her mere speculation. The evidence she has put forward does not suffice for a prima facie case that she was subject to disproportionate hours at

1 the front desk after filing the 2010 EEOC Charge.

2 Fourth, Coleman argues it was retaliation when Lori Thomas told employees to
3 bypass Coleman and give employee related documents directly to Thomas instead. (Doc.
4 93 at 12.) The only evidence cited for this is Coleman's testimony that "when Lori was
5 working on the personnel file, she did tell all the employees if any documentation should
6 come in, to give it to her, not to me." (Doc. 79-1 at 500.) It is unclear what "personnel
7 file" this refers to, but in any event there is no explanation of how this arrangement
8 changed things in a way that would have negatively affected Coleman. Perhaps her
9 testimony is meant to imply that before this, employees would have delivered the files
10 directly to Coleman. Even so, that is not the kind of change that would deter a reasonable
11 employee from pursuing a discrimination complaint. Moreover, it is undisputed that her
12 personnel files were in disorder, and the Defendants plainly had a legitimate non-
13 discriminatory reason for this instruction.

14 Fifth, Coleman contends it was retaliation that two different supervisors did not
15 meet with her to go over her poor performance evaluation despite initially agreeing to do
16 so. (Doc. 93 at 12-13.) As noted below, receiving a poor performance evaluation, if
17 undeserved, is one thing. But being denied a follow up meeting, even if initially
18 promised one, would not by itself deter a reasonable employee from making a future
19 complaint of discrimination.

20 Sixth, Coleman says it was retaliation when Lungwitz confronted her about the
21 2010 EEOC charge shortly after it was filed. (Doc. 93 at 8-9.) As Coleman tells it,
22 Lungwitz came into Coleman's office unannounced, told her "that she couldn't wait
23 around on" the EEOC investigator, and said to Coleman, "You should've come to me
24 first." (Doc. 79-1 at 587-90.) As a result, Coleman felt "intimidated" and "scared."
25 (Doc. 92, ¶ 335.) The standard, however, is whether a *reasonable* employee would have
26 been deterred from taking protected actions, not whether Coleman in fact found the
27 interaction off-putting. *See Thompson*, 562 U.S. at 174. The employer and employee are
28 required to try to resolve their dispute, unlike most areas of law where a plaintiff can just

sue and go to court. Even on Coleman's version of what happened, her meeting with Lungwitz as a matter of law could not have deterred a reasonable person from alleging discrimination in the future. Moreover, at oral argument Coleman's attorney conceded that her interaction with Lungwitz is meant to serve only as evidence of Defendants' retaliatory motive generally, not as an actionable retaliatory incident on its own. That incident did not amount to actionable retaliation, as Coleman now acknowledges.

Finally, Coleman's one-time exclusion from a 2011 meeting with insurers about the company's health plan was a trivial matter and not actionable retaliation. But even if it was non-trivial, as discussed below, Defendants had unrebutted non-discriminatory reasons for doing so.

In the end, Coleman has alleged several incidents—her termination and negative evaluations from supervisors—that suffice for a prima facie showing of adverse employment actions. (The negative evaluations began before Coleman engaged in any protected action.)

**C. Causal Link**

Next, Coleman must show that any adverse actions taken against her were causally connected to her protected activity. To demonstrate a sufficient causal link, a Title VII or ADEA plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, --- U.S. ----, 133 S. Ct. 2517, 2534 (2013). The plaintiff thus bears the burden to show that her protected action was more than a mere "motivating factor" in the retaliation. *Stilwell*, 831 F.3d at 1247.

Defendants only challenge causality as to Coleman's discharge. They assert two reasons why Coleman cannot establish a causal link to her discharge. First, they argue that the eight-month gap between the 2010 EEOC Charge and Coleman's 2011 termination "belies any inference of unlawful retaliation." (Doc. 82 at 13.) An inference of retaliation is not plausible where eight months have elapsed. *See Clark Cty. School Dist. v. Breeden*, 532 U.S. 268, 272-73 (2001) (two years after protected action);

*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) ("A nearly 18-month lapse between protected activity and an adverse employment action is simply too long, by itself, to give rise to an inference of causation."); *Skylarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015), *cert denied*, 135 S. Ct. 2861 (2015) (six-month lapse between plaintiff's EEOC complaints and adverse employment); *Musolf v. J.C. Penney Co., Inc.*, 773 F.3d 916, 919 (8th Cir. 2014) (seven months).

Second, Defendants argue that because Coleman began receiving discipline and negative job feedback before her supervisors first learned of the 2010 EEOC Charge, her subsequent termination was an extension of feedback she had already been receiving. (*Id.*) Again, Defendants challenge for lack of causation only her claim of retaliation by termination. But the fact that Coleman received negative feedback before her 2010 EEOC Charge goes to whether the Defendants had legitimate nondiscriminatory reasons for her termination (which is addressed below), not whether she has made a prima facie showing of causation.

Thus Coleman cannot make out a prima facie causal link between her termination and the 2010 EEOC Charge.

### D. Legitimate Nondiscriminatory Reasons

With Coleman having made out a prima facie case for some incidents of retaliation, the burden shifts to Defendants to offer legitimate nondiscriminatory (here, non-retaliatory) reasons for the adverse actions. *See Ray*, 217 F.3d at 1240. Defendants meet their burden of doing so.

Defendants offer a sensible reason for giving Coleman poor performance reviews, admonishing her, and ultimately terminating her employment: she was not able to meet the demands of the job. They point to several specific incidents from before her 2010 EEOC Charge demonstrating that Coleman's performance was falling short. For instance, a fall 2010 review of company personnel files revealed that Coleman was not completing numerous aspects of her job, such as correctly inputting data into the computer systems, adequately tracking employee licensing, and keeping employee files

current. (Doc. 79, ¶ 109.) With a government audit looming, Coleman's supervisors had to hurriedly bring their records into compliance to avoid having their professional licenses suspended, a scramble made necessary by Coleman's lack of diligence. (Doc. 79, ¶¶ 105, 114-17.) She received a warning for this on October 15, 2010. (Doc. 79, ¶ 118.)

From there Defendants contend Coleman's attitude toward the job and her coworkers deteriorated steadily, both before and after she filed the 2010 EEOC Charge in November. (Doc. 79, ¶¶ 129-33.) In February of 2011, Coleman revealed she did not know company policies regarding eligibility for benefits. (Doc. 79, ¶ 82.) The next month, Defendants' Director of Nursing complained to Coleman's supervisors that Coleman was disruptively unprepared for a human resources meeting with a staff member. (Doc. 79, ¶ 83.) Two days later, an employee complained that Coleman had failed to provide the employee with critical insurance paperwork, a mistake that would have eliminated the employee from the applicable programs if another staff member had not caught it in time. (Doc. 79, ¶ 84.) On May 24, 2011, Coleman arrived late to a telephonic meeting her supervisors had required her to attend and failed to notify anyone ahead of time that she would be delayed. (Doc. 79, ¶ 166.)

Defendants also brought in an independent, outside consultant to assess the state of the Human Resources department. (Doc. 79, ¶ 172.) The consultant identified at least twelve significant deficiencies in Coleman's job performance that could expose Defendants to liability and advised them to hire a "human resources professional" to take over. (Doc. 79, ¶ 185-89.) (The result was that Defendants eliminated Coleman's position altogether and brought in a number of outside groups to run the department before settling on someone satisfactory. *See* Doc. 79, ¶¶ 198-200, 19-27.) Defendants maintain that they fired Coleman based on this lengthy history of performance deficiencies and a decision to outsource the human resources function. (Doc. 79, ¶ 198.) That rationale, if genuine, more than suffices as a legitimate, non-retaliatory reason for giving her poor performance evaluations, issuing her written and verbal warnings, and

ultimately terminating her from her position.

Though it has already been deemed trivial, it is worth noting that Defendants also proffer legitimate reasons for Coleman's exclusion from the 2011 health plan meeting. They maintain that Coleman was excluded because the meeting "focused on finances rather than plan selection," and thus her attendance "was not necessary . . . because Defendants were not planning to make any material changes to the benefits plan." (Doc. 82 at 14 n.2; Doc. 79, ¶¶ 276-78.) That explanation is reasonable and, if true, does not amount to retaliation. Defendants have therefore met their burden of showing legitimate, non-retaliatory reasons for all of the challenged actions.

### E. Pretext

The burden now shifts back to Coleman to produce "specific, substantial evidence of pretext." *Wallis*, 26 F.3d at 890 (internal quotation marks omitted). This requires more than simply "denying the credibility of the defendant's proffered reason for the challenged employment action . . . [or] relying solely on the plaintiff's subjective belief that the challenged employment action was unnecessary or unwarranted." *Cornwell v. Electra Central Credit Union*, 439 F.3d 1018, 1028 n.6 (9th Cir. 2006) (citation omitted).

Coleman denies the deficiencies Defendants say formed the basis for her poor evaluations, admonitions, and termination. However, she does not point to any evidence that those deficiencies did not exist. Instead, she relies on general evidence that she received good performance evaluations until as late as March of 2010. But that all predated Defendants' discovery of and action on Coleman's recurring deficiencies, the corrective action having been underway before Coleman filed her EEOC charge. In any event, denying a fact without specific competing evidence is insufficient to defeat summary judgment. To create a "genuine dispute," Coleman must point to admissible evidence in conflict with the evidence Defendants relied on. *See* Fed. R. Civ. P. 56(a).

There is no genuine dispute over whether Coleman was keeping employee files current and complete. The record shows she was not. There is no genuine dispute that Coleman's supervisors learned in 2011 that she did not know about and was not

adequately performing basic aspects of her job. There is no genuine dispute that Coleman's performance deficiencies nearly left one employee locked out of benefits.[3] Nor is there a genuine dispute that Coleman did arrive late to the May 24, 2011 telephonic meeting without notifying her supervisors. All of this is compatible with the notion that Coleman was a hard worker who had performed well at her job in the past. Her poor performance may have been her fault, or it may have resulted from Defendants having promoted her in August of 2007 to a position beyond her ability. (Doc. 93 at 14.)

The record here plainly shows Defendants terminated her for her deficient job performance with specific evidence that her performance was not up to snuff. The question is not whether Defendants set Coleman up for failure well before she ever filed the 2010 EEOC Charge. A retaliation claim will only lie if Coleman can show that Defendants' explanation for her termination, namely poor performance, was just a pretext for unlawful retaliation. Coleman has not offered the "specific, substantial evidence" required for that showing. *See Wallis*, 26 F.3d at 890. Overpromotion, if that's what it was, does not vest an employee with a Title VII or ADEA right to tenure after the employer discovers its mistake and takes action to get the job done.

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (Doc. 82) is granted.

IT IS FURTHER ORDERED that the Clerk enter judgment in favor of Defendants against Plaintiff and that Plaintiff take nothing.

Dated: August 28, 2017.

_____
Neil V. Wake
Senior United States District Judge

---

[3] Coleman does not deny this happened but complains that Defendants do not disclose the employee's name. (Doc. 92, ¶ 84.) Coleman could have denied this if it did not happen, but she did not do so.

- 17 -